IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 14, 2019

**STATE OF TENNESSEE v. JOSEPH E. GRAHAM**

**Appeal from the Circuit Court for Montgomery County**
**No. 63CC1-2016-CR-1227        William R. Goodman, III, Judge**

_____

**No. M2019-00388-CCA-R3-CD**

_____

The Defendant, Joseph E. Graham, was convicted by a Montgomery County Circuit Court jury of two alternate theory counts of felony murder; one count of especially aggravated burglary, a Class B felony; seven counts of especially aggravated kidnapping, Class A felonies; and five counts of attempted aggravated robbery, Class C felonies. The trial court merged the felony murder convictions and sentenced the Defendant to an effective term of life plus twenty years. On appeal, the Defendant argues that: (1) the evidence is insufficient to sustain his convictions, and there was insufficient evidence corroborating co-defendant Cheeks' accomplice testimony; (2) the trial court erred in limiting his cross-examination of co-defendant Cheeks and excluding relevant evidence; and (3) he is entitled to a new trial based on the newly discovered evidence of co-defendant Cheeks' testimony at co-defendant Shelton's trial. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J. ROSS DYER, JJ., joined.

Kenneth W. Merriweather (at motion for new trial and on appeal), Clarksville, Tennessee, and Roger E. Nell, District Public Defender, (at trial), for the appellant, Joseph E. Graham.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Arthur Bieber and Robert J. Nash, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## FACTS

The Defendant and two co-defendants, Curtis O. Shelton, Jr., and Kentavius Montrell Cheeks, were indicted for two counts of felony murder under different predicate felonies; one count of especially aggravated burglary; seven counts of especially aggravated kidnapping; and seven counts of attempted aggravated robbery,[1] arising out of their breaking into a home on July 21, 2013, and encounter with the occupants inside.

Four of the nine people who were in the house the night of the incident testified at trial. For brevity we have consolidated their testimonies as much as possible. On the night of July 20, 2013, the residents of 727 Ranch Hill Drive had "a small get-together with friends" involving alcohol and "[s]hrooms." Guests began to leave around 10:00 p.m. and by 2:00 a.m., Myles Hendrick ("the victim"[2]), Cody Shelton, Christopher Roberts, Dillon Correa, Brandi Davis, William Brock, Gregory Berger, and Donald Ware and his girlfriend remained. The victim, Mr. Correa, Mr. Brock, and Mr. Berger were in the basement of the home, and Mr. Shelton and his girlfriend, Ms. Davis, were in a bedroom on the third level. Mr. Ware and his girlfriend were in another bedroom on the third level, and Mr. Roberts was on a couch on the main level.

Mr. Brock went upstairs to the third level to get a sleeping bag, and Mr. Correa went to the kitchen on the main level to get a snack. While Mr. Correa was in the kitchen, he saw three African-American men wearing masks enter into the basement. At first, he thought it was friends pulling a prank with Airsoft guns but realized it was "an actual Hi-Point nine[-]millimeter with a four inch barrel" when one of the intruders pointed it at him. He was ordered to the basement and "hog tied" with duct tape. The victim was bound with duct tape around the same time as Mr. Correa.

When Mr. Brock returned to the basement, he heard the sound of "ripping and tearing" and saw Mr. Correa's feet sticking out from the doorway. Mr. Correa's legs were taped around the ankles. Two intruders rounded the corner; one pointed a gun at Mr. Brock, and the other came at him with a crowbar. He was ushered into the basement where he saw a third intruder, who was wielding a rubber mallet. They "hog tied" Mr. Brock with duct tape.

---

[1] At the conclusion of the State's case, the trial court granted the Defendant's motion for judgment of acquittal as to two of the attempted aggravated robbery charges.

[2] Because there are numerous victims in this case, we will refer to the deceased victim as "the victim" and to the remaining victims by name.

Mr. Berger was asleep on a couch in the basement when he awakened to a crowbar striking him on the back of the head and a gun pointed at his face. The intruders tied him up with rope.

Mr. Shelton, who heard a commotion in the basement when he was going outside to smoke, opened the basement door and saw Mr. Brock being tackled by an intruder at the bottom of the stairs. One of the other intruders pointed a gun at him and ordered him to come downstairs and lie on the floor. Mr. Shelton complied, and he was bound up with duct tape as well.

At various times, two of the intruders went upstairs and one remained downstairs keeping watch. Ms. Davis and Mr. Roberts were brought to the basement and bound with duct tape. The intruders demanded money, drugs, and electronics from their captives and assailed some of them when their demands were not answered.

The victim broke free while two of the intruders were upstairs and attacked the man who was watching everyone in the basement. Mr. Brock, Mr. Berger, and Mr. Roberts then broke free and joined the victim in attacking the intruder. Mr. Berger and Mr. Roberts rammed the intruder through the drop ceiling tile and threw a television on top of him. Mr. Brock hit him with a thick glass hookah base. Ms. Davis broke free and threw a dumbbell at him. Mr. Correa was the last to break free and join in the attack. The intruder yelled to his confederates, "[H]ey, D, come down here, get down here," and the two other intruders came back downstairs. One of them shot the victim, and all three fled.

Officer Christopher MacMillan with the Clarksville Police Department responded to the scene around 3:00 a.m. A "visibly upset" woman waved him down outside. When he entered the home, he saw a couple of large flat screen televisions sitting by the stairwell, and there were three or four pajama-clad men in the living room. The men directed Officer MacMillan and Sergeant Gregory Beebe, another Clarksville Police Department officer who arrived to the scene, downstairs to where the victim was located.

Officer MacMillan recalled that the basement room was set up "sort of like a hangout room" with Bob Marley and Beatles posters on the wall and a disco ball hanging from the ceiling. The room was dimly lit but was bright enough to see. There was a television in the room, but it was knocked over as from "a scuffle." The victim was on the far-side of the room, and a man was trying to apply pressure to the victim's chest. Sergeant Beebe attended to the victim, and Officer MacMillan took the witnesses upstairs to obtain statements. Everyone was "upset and excited about what had happened." At least two men had duct tape around their wrists and feet, and at least two men had gashes

- 3 -

on the back of their heads like they had been hit with something. Medical personnel arrived on the scene and attended to those with injuries.

The victims reported that three African-American men had broken into the house and ushered some of them to the basement, where they bound their arms and legs with duct tape. The assailants were wearing masks, and one was armed with a gun and another with a crowbar. One of the victims, who was in the Army, believed that the assailant's gun was a Hi-Point pistol. A shell casing was found at the top of the stairs.

Sergeant Beebe testified consistently with Officer MacMillan. Sergeant Beebe observed a gunshot wound on the left side of the victim's chest. The victim was able to say that his name was Myles Hendrick and that he did not know who had shot him.

Kentavius Cheeks testified that he was charged with the same offenses as the Defendant and Curtis Shelton.[3] He faced a sentence of life in prison, but he pled guilty in exchange for a sentence of twenty-five years at 100 percent. Mr. Cheeks recalled that on the night of July 20, 2013, he, the Defendant, and Curtis Shelton were riding around their neighborhood in Curtis Shelton's car when they drove by the victims' house. There was a party going on at the victims' house, and they watched as a man dropped money by his car. The Defendant noted that the people were probably drunk and that they should "hit a lick," meaning commit a robbery. They went to Curtis Shelton's house where he obtained a gun, gloves, and black shirts. They tied the shirts around their faces from the nose down. They parked a few streets away and jumped a fence to get to the victims' house. They entered the house through the "wide open" garage in the back. When they entered the house, Curtis Shelton had a gun, and the Defendant had a crowbar that he had obtained at some point.

Mr. Cheeks recounted how the three of them proceeded to restrain the individuals in the house. He recalled that he and Curtis Shelton left the Defendant in the basement with the individuals who were already tied up to check the rest of the house for items to take. They inadvertently woke up Ms. Davis while taking a television out of the room she was in, so Curtis Shelton took her to the basement where she was bound up like the others. At some point while he and Curtis Shelton were looking around the rest of the house, they heard a rumbling noise coming from the basement and went to investigate. When they got to the bottom of the basement stairs, the victim struck Curtis Shelton with some object, and Curtis Shelton shot him.

---

[3] Because this co-defendant has the same surname as one of the victims, we will refer to him by his full name.

Mr. Cheeks recalled that Curtis Shelton fled, and he followed. As they fled, Mr. Cheeks commented about Curtis Shelton's shooting the victim, and Curtis Shelton advised him not to say anything or he would kill him and his family. They realized that the Defendant was still in the house and went back to find him, but he was then on his way out and the three ran off together. The Defendant was angry that the other two had left him in the basement to "get jumped." The Defendant was limping and his arm was hurting. However, Mr. Cheeks acknowledged that this was the first time he mentioned that the Defendant's arm was hurting. Mr. Cheeks said that Curtis Shelton later told him that he had hidden the gun in the woods.

Mr. Cheeks confirmed that he gave a verbal statement to police on April 16, 2014, before he was formally charged with the crimes or offered a plea deal, in which he described the facts as he just had at trial. He later gave a written statement to police on March 11, 2016. Mr. Cheeks acknowledged that he learned the State's understanding of the events when he reviewed the discovery packet, which was after he gave his initial statement but before he gave his written statement.

Mr. Cheeks stated that he did not admit to being involved in the burglary during his first interview with police because Curtis Shelton had threatened to kill him and his family. In fact, he initially denied knowing Curtis Shelton. Mr. Cheeks did not remember if he had lied to his family by telling them that he had asked for a lawyer during his first interrogation with the police when he had not actually asked for one.

Investigator Timothy Anderson with the Clarksville Police Department detailed the actions he took in investigating the case. He testified that he checked with nearby hospitals to see if anyone had been treated for injuries consistent with the struggle that occurred during the invasion. In doing so, he drove to Gateway Hospital, where he encountered the Defendant. He asked the Defendant why he was at the hospital, and the Defendant responded that his shoulder had been injured while wrestling with a friend who body-slammed him. The Defendant had a bag of ice on his shoulder, and a nurse was putting his arm in a sling. Investigator Anderson recalled that several hours later that same day, he encountered the Defendant again while canvassing the neighborhood of the crime scene. The Defendant lived a quarter of a mile from the home where the invasion occurred and was out walking in the neighborhood. Investigator Anderson acknowledged that he did not return to the hospital another time or follow up with hospital personnel to see if anyone else showed up with injuries consistent with "being walloped by three really huge guys[.]"

Investigator Anderson acknowledged that none of the evidence collected at the scene resulted in a match with the Defendant's fingerprints. He recalled that he conducted a photograph array with the victims, and no one identified the Defendant. Mr.

Roberts identified an individual who had "similar features from top of nose and up" of the male they struggled with, but the individual he identified was not the Defendant.

Dr. Mark Muiznieks was working in the emergency room at Gateway Medical Center on July 21, 2013. Dr. Muiznieks saw the Defendant around 1:30 p.m. when he presented with the complaint of moderate to severe pain in his left shoulder. The Defendant advised the doctor that the injury occurred the night before when he was wrestling and "he fell and landed on his left shoulder." An x-ray showed that there was a fracture through the lateral portion of the left clavicle. The doctor said that the Defendant's injury was consistent with wrestling. The doctor stated that he would not have necessarily documented injuries like a black eye, busted lip, or hurt ear.

Dr. Erin Carney, a forensic pathologist, recounted the findings from her autopsy of the victim for the jury, which included a recitation of the injuries he sustained. A gunshot wound to the chest was determined to be the cause of death, and the manner of death was homicide. The victim's toxicology test was positive for marijuana, and there was duct tape stuck on his left ankle.

Clarksville Police Department Officer Darren Koski took photographs of the crime scene, and Officer William King collected evidence. Among the items Officer King collected, he recounted that a wrench and rubber mallet were found on the living room couch. The drop-ceiling in the basement was damaged, and hair was found in a ceiling tile. Numerous samples of duct tape were recovered, and a spent nine-millimeter shell casing was found on the basement stairway landing. Officer Michael Ulrey collected a piece of rope from the scene a few days after the incident.

At some point, the police received a tip from a jail inmate that the Defendant, Curtis Shelton, and Kentavius Cheeks were involved in the home invasion. Mr. Cheeks was interviewed on two separate occasions and "admitted his involvement and the involvement of the others."

The police took known DNA samples from all of the victims and suspected perpetrators. The Defendant's fingerprints were not identified on anything at the scene of the crime. The victims were not able to identify anyone from photograph arrays. Approximately twenty-four items of evidence, which included 194 pieces of duct tape, were submitted to the Tennessee Bureau of Investigation ("TBI") for microanalysis, and one came back with the Defendant's DNA. Five items were sent to the Federal Bureau of Investigation ("FBI") for analysis, and the Defendant's DNA was not found on any of them.

Officer Avery Lambert with the Clarksville Police Department testified that in March 2015, he responded to an unrelated shooting, and a woman informed him that there was an object laying on the grass by her home on Cherry Tree Lane. The object turned out to be a black nine-millimeter Hi-Point handgun.

Agent Shelly Betts, a firearms examiner with the TBI, testified that testing revealed that a shell casing recovered from the scene was fired from the firearm recovered by Officer Lambert in March 2015.

Agent Gregg Fort, a forensic scientist with the TBI, performed the DNA analysis on the items submitted to the TBI. On one of the pieces of duct tape submitted, Agent Fort obtained a DNA profile "consistent with a mixture of two individuals. The major contributor profile matched [the Defendant,] and the minor profile matched [the victim]." Mr. Fort said that the "probability of randomly selecting an unrelated individual with the same DNA profile is one in a number greater than the current world population for the African American, Caucasian and South Western Hispanic populations." On cross-examination, Agent Fort acknowledged that he could not say where, when or how the Defendant's DNA got on the piece of duct tape. On redirect, Agent Fort stated that the DNA of Curtis Shelton, Mr. Cheeks, and three of the victims was not found on any of the evidence that he tested.

Agent Miranda Gaddes, a forensic scientist with the TBI, testified that she conducted physical comparisons of 194 pieces of torn duct tape and did not find anything that she could match to any person.

Agent Dabney Kirk, a latent print examiner with the TBI, examined pieces of duct tape, money, a wrench, a cartridge, and some latent prints from the scene. She did not find the Defendant's fingerprints on any of the items she examined. Agent Kirk said that she would not expect to find fingerprints when a glove was worn.

Following the conclusion of the proof, the jury convicted the Defendant as charged.

## ANALYSIS

### I. Sufficiency and Corroboration

The Defendant challenges the sufficiency of the evidence. He asserts that the duct tape found at the crime scene bearing his DNA was not reliable evidence to establish his identity as a perpetrator and that co-defendant Cheeks' testimony lacked credibility. He also asserts that there was not sufficient evidence to corroborate Mr. Cheeks' testimony.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523, 527 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with

which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The Defendant claims that the duct tape found at the crime scene bearing his DNA was not reliable evidence to establish his identity as a perpetrator because duct tape is an "easily movable object and an object that a person would touch in daily life," and the State's expert could not testify as to "where, when, or how [his] DNA came to be on the duct tape." However, the expert's being unable to say how the Defendant's DNA came to be on the duct tape does not diminish the fact that the Defendant's DNA was on the duct tape, alongside the murder victim's DNA. In addition, the Defendant was treated at a nearby hospital later the day of the murder for a fracture to his left clavicle, and the victims testified at trial describing how they attacked the intruder who remained in the basement while the other two intruders searched the house. The Defendant's injury provides additional physical evidence linking him to the crime.

The Defendant also claims that co-defendant Cheeks' testimony lacked credibility and "was impeached on several occasions." He points out that Mr. Cheeks lied to his family, tried to undo his guilty plea by filing a petition for post-conviction relief, and testified against the Defendant to "keep himself from serving a Life sentence." However, it is the province of the jury to assess a witness's credibility and by its verdict, the jury found Mr. Cheeks credible. We will not second-guess its determination.

The Defendant also argues that there was not sufficient evidence to corroborate Mr. Cheeks' accomplice testimony. "An accomplice is defined as a person who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." State v. Anderson, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing State v. Perkinson, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). A criminal defendant in Tennessee cannot be convicted solely on the uncorroborated testimony of an accomplice. State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001) (citing State v. Stout, 46 S.W.3d 689, 696 (Tenn. 2001); State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); State v. Robinson, 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997)). This principle has been described as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the

requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

Bigbee, 885 S.W.2d at 803 (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). Whether sufficient corroboration exists is for the jury to determine. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). The jury determines "the degree of evidence necessary to corroborate the testimony of an accomplice, and it is sufficient 'if there is some other evidence fairly tending to connect the defendant with the commission of the crime.'" State v. Anderson, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (quoting Clapp v. State, 30 S.W. 214, 217 (Tenn. 1895)).

As detailed above, the Defendant's DNA was found on a piece of duct tape along with the victim's DNA, and the Defendant was treated at a nearby emergency room later the day of the incident for a fractured clavicle. This evidence fairly connects the Defendant to the crime to corroborate co-defendant Cheeks' testimony.

## II. Questioning of Mr. Cheeks

The Defendant challenges the trial court's not allowing him to question Mr. Cheeks about the possible sentence he faced without his plea agreement and about his filing a petition for post-conviction relief. The Defendant asserts that the trial court's ruling was an unreasonable restriction on his right to cross-examination and also that the questioning was relevant and therefore should have been allowed.

Prior to Mr. Cheeks testifying, defense counsel sought direction from the trial court as to the permissible parameters of cross-examination. Mr. Cheeks faced the same charges as the Defendant and Curtis Shelton, as well as unrelated charges in another case. Defense counsel calculated Mr. Cheeks' possible exposure at life imprisonment plus 236 years. The trial court ruled that the defense could elicit that Mr. Cheeks faced a possible life sentence if he had gone to trial and that his plea agreement was for a twenty-five-year sentence. However, the court found that going into more depth about Mr. Cheeks' potential sentence would indirectly expose the jury to the possible sentence the Defendant faced, which was not permissible. The court elaborated that eliciting that Mr. Cheeks faced life plus a certain number of years "gets into the realm of sentencing and . . . is somewhat speculative."

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence, subject to certain exceptions, is generally admissible under Rule 402 of the Tennessee Rules of Evidence. Relevant evidence may be excluded under Rule 403, however, if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Questions regarding the relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)).

The propriety, scope, manner, and control of the cross-examination of witnesses rest within the discretion of the trial court. State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). However, "a defendant has the right to examine witnesses to impeach their credibility or to establish that the witnesses are biased. This includes the right to examine a witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness." State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001). This court will not disturb a trial court's limits on cross-examination unless we find that the court has placed unreasonable restrictions on that right. State v. Wyrick, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001); Dishman, 915 S.W.2d at 463.

The Defendant concedes that Tennessee Code Annotated section 40-35-201(b) provides that "[i]n all contested criminal cases, . . . the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses." We cannot conclude that the trial court abused its discretion in determining that expounded questioning about the sentence Mr. Cheeks faced for the same charges as the Defendant indirectly and impermissibly exposed the jury to the possible sentence the Defendant faced.

However, the Defendant asserts that he should have been allowed to question Mr. Cheeks as to his possible penalties, "not to inform the jury as to the possible punishment of the [Defendant,]" but for purposes of impeachment. Regardless if the "intent" behind the line of questioning was for purposes of impeachment, if the effect informed the jury about the punishment the Defendant faced, we discern no abuse of discretion in the trial court's limitation on cross-examination. Moreover, for purposes of impeachment or establishing bias, there is no practical difference between questioning Mr. Cheeks about his facing the possibility of spending life in prison versus life plus some amount of years. Under either scenario, the Defendant would have established that Mr. Cheeks took a plea

deal that involved testifying against the Defendant and avoided the possibility of spending the rest of his life in prison.

In addition, the Defendant asserts that, in the alternative, he should have been allowed to cross-examine Mr. Cheeks on the possible penalty he faced on his aggravated assault charge as the Defendant was not charged with that offense. However, the Defendant was able to bring out Mr. Cheeks' possible motive to testify against him and, again, with regard to establishing a witnesses' possible bias, we discern no practical difference between a life sentence and life plus some years.

With regard to the Defendant's claim of the exclusion of relevant evidence, although evidence of the exact potential sentence Mr. Cheeks faced was arguably relevant to establish bias, even relevant evidence might not be admissible if "rules or laws of general application in the courts of Tennessee" exclude it. See Tenn. R. Evid. 402. As noted above, Tennessee Code Annotated section 40-35-201(b) provides for the exclusion of that line of questioning.

Turning to the Defendant's seeking to question Mr. Cheeks about having filed a post-conviction petition, during cross-examination, defense counsel asked Mr. Cheeks if he thought he was guilty of anything from that night. The State objected on grounds of relevancy, and defense counsel responded that the questioning was relevant to Mr. Cheeks' credibility. Defense counsel elaborated that Mr. Cheeks pled guilty under oath and then subsequently filed a petition for post-conviction relief stating that he was not guilty of what he pled guilty to under oath. The State argued that whether Mr. Cheeks believed he committed a crime "is of no significance in this courtroom" and would confuse the jury.

In ruling on the issue, the trial court found:

> Many times it's kind of hard for lay people to accept the fact that a homicide that occurs as a result even attempting to perpetrate a theft qualifies as a first degree murder. It's just a difficult thing, but that's – that's what[] has been enacted by the general assembly and what, quite frankly, has been the law of this land for some time.
>
> To have this witness then testify as to whether he, in his heart of hearts, believes that he has committed a crime, all it does, I find, is confuse the issues, which under 403 then it could be relevant but the confusion of issues outweighs that relevance; therefore, I am not going to allow you to ask that question do you think you're guilty of a crime.

- 12 -

Granted, a petition for post[-]conviction relief was filed. It was withdrawn. That's another proceeding. It is not involved in this proceeding. As we covered earlier, you can make inquiry as to the agreement that he entered into with [the] State so far as his plea, what he possibly was facing so far as a life sentence and the sentence he did receive.

During an offer of proof, Mr. Cheeks admitted that he pled guilty to second degree murder under oath after being apprised of the terms of his plea agreement and hearing a recitation of the supporting facts. He acknowledged that he filed a petition for post-conviction relief with the intention to undo his plea agreement but said that he did so after other inmates "g[o]t in [his] head" and made him think that he could "beat [his] case." After learning that a grant of post-conviction relief meant that he would face the original charges, he decided it was in his best interest to withdraw the petition.

The trial court did not abuse its discretion in determining that Mr. Cheeks' belief that he was not guilty of murder because he did not personally pull the trigger would have confused the jury about the issues in the Defendant's case and outweighed the possible relevance of such questioning.

We additionally want to address here that the Defendant repeatedly asserts that the State could not have proven his identity without Mr. Cheeks' testimony. However, the Defendant's claim that Mr. Cheeks' testimony was the sole evidence linking him to the murder is not correct. As we discussed above, the Defendant's DNA was found on a piece of duct tape from the crime scene along with the DNA of the murder victim, and the Defendant was treated for a fractured clavicle later the day of the murder at a nearby hospital, an injury that certainly could have been sustained during the attack described by the victims.

### III. Newly Discovered Evidence

The Defendant lastly argues that he is entitled to a new trial based on the newly discovered evidence of co-defendant Cheeks' testimony at co-defendant Shelton's trial. We note that the Defendant has supplemented the appellate record with the aforementioned testimony in response to the State's assertion that he had waived the issue by failing to include the necessary transcripts.

To be entitled to a new trial on the basis of newly discovered evidence, a defendant must show (1) that he or she used reasonable diligence in seeking the newly discovered evidence; (2) that the new evidence is material; and (3) that the new evidence will likely change the result of the trial. See State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994). The trial court is to determine the "'credibility of newly discovered

- 13 -

evidence for which a new trial is asked,'" and the motion should be denied unless the court is assured that the testimony would be worthy of belief by the jury. See State v. Walker, 910 S.W.2d 381, 395 (Tenn. 1995) (quoting Rosenthal v. State, 292 S.W.2d 1, 5 (Tenn. 1956)). When the newly discovered evidence could have no other effect than to "discredit the testimony of a witness at the original trial, contradict a witness' statements or impeach a witness," the trial court should not order a new trial "unless . . . the evidence impeaching the witness [was] so strong and convincing that a different result at trial would necessarily follow." State v. Rogers, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985). Whether to grant a new trial on the basis of newly discovered evidence lies within the sound discretion of the trial court. See State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997).

The Defendant contends that he is entitled to a new trial because Mr. Cheeks contradicted his trial testimony when he testified at Curtis Shelton's trial. We cannot conclude that trivial discrepancies and explainable differences between Mr. Cheeks' testimony at the Defendant's trial and Curtis Shelton's trial, who had threatened to kill Mr. Cheeks and his family, would have necessarily resulted in a different outcome in the Defendant's case. Moreover, the State's case did not rely solely on Mr. Cheeks' testimony, as there was DNA evidence and the Defendant's hospital visit in the hours after the incident that support his involvement. The trial court did not abuse its discretion in denying the Defendant's request for a new trial based on Mr. Cheeks' testimony at Curtis Shelton's trial.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE